**SOUTHERN RY. CO. v. BLUE RIDGE POWER CO.**

**BLUE RIDGE POWER CO. v. SOUTHERN RY. CO.**

Circuit Court of Appeals, Fourth Circuit. January 14, 1929.

Concurring Opinion January 17, 1929.

Nos. 2781, 2785.

34

H. J. Haynsworth, of Greenville, S. C., and S. R. Prince, of Washington, D. C. (Haynsworth & Haynsworth, of Greenville, S. C., and L. E. Jeffries, of Washington, D. C., on the brief), for Southern Ry. Co.

E. T. Cansler, of Charlotte, N. C., Horace L. Bomar, of Spartanburg, S. C., and Charles W. Tillett, of Charlotte, N. C. (Cansler & Cansler, of Charlotte, N. C., Bomar & Osborne, of Spartanburg, S. C., and Tillett, Tillett & Kennedy, of Charlotte, N. C., on the brief), for Blue Ridge Power Co.

Before WADDILL and NORTHCOTT, Circuit Judges, and WILLIAM C. COLEMAN, District Judge.

WADDILL, Circuit Judge. These cases involve the same questions and subject-matter, that is to say, the costs of construction of a railroad bridge for the Southern Railway Company across the Green river in the state of North Carolina, on its road between Asheville, N. C., and Spartanburg, S. C.; the work being in connection with the development of the power plant of the Blue Ridge Power Company at and below where the railroad crosses the Green river, known as "Site 8."

In the first-named case, No. 2781, an action at law was in December, 1922, instituted in the United States District Court for the Western District of North Carolina, at Charlotte, by the Blue Ridge Power Company, hereinafter referred to as the Power Company, to recover from the Southern Railway Company, hereinafter referred to as the Railroad Company, the sum of $253,924.06, being a portion of the cost of the construction of said railroad bridge and its approaches, claimed by the Power Company to be due it

by the Railway Company, with interest thereon from March 24, 1920. The Power Company averred that the approximate cost of the bridge and approaches was $320,118.28, which included the relocation and building of a mile of track, and that the Power Company had an agreement with the Railroad Company that it was not to bear more than $66,194.32 of the expense, which, deducted from the total cost aforesaid, left the amount sued for, $253,924.06.

The Railroad Company answered, denying that it owed the plaintiff any such sum as that sued for, but averred that, on the contrary, its liability in connection with the construction of the bridge and tracks and all costs thereof was limited to $8,000, which sum the Railway Company claimed was all it had agreed to pay. The defendant Railway Company further claimed that there was due it $20,178.39 for work performed by it necessary to complete the construction agreed to be done by the plaintiff under the contract, and that there was also due it the further sum of $3,049.38, for expense incurred in the removal of the old bridge, which was also undertaken by the plaintiff.

Upon the respective claims of the parties thus stated, it will be seen that the dispute and issues in the case arose in connection with the plaintiff's enlarging and developing its power plant, at or near the point where the defendant's railroad crosses the Green river, which, among other things, involved the building of a new bridge, the raising of the tracks of the defendant Railroad Company, the relocation and extension thereof, and the making of other alterations incidental thereto.

Many interviews were had between the officials of the two companies regarding the proposed work, but, as found by the trial judge, no agreement was ever actually consummated respecting the exact extent of the work to be done, or the respective proportions of costs to be borne by the parties, nor was there an actual meeting of the minds of the contracting parties in these particulars, though the District Judge found that the Railway Company, in the light of what occurred, bound itself to bear such part of the cost of construction as represented actual benefits received by the Railroad Company therefrom.

Two plans for the development were long under consideration, one of which contemplated that the Power Company should pay $66,000, and the Railway Company $8,000. This plan was, however, abandoned, and the plan of Major Wells, chief engineer of the Railroad Company, was suggested in lieu thereof. Before the Wells plan was finally

agreed upon, but after considerable work had been done thereunder by the Power Company, what was known as the Knoxville Plan was suggested and insisted upon by the Railroad Company, and substituted for the Wells proposition. In addition to this enlargement of the work, after the Railway Company had passed under federal control in January, 1918, further extensions thereof were ordered by the officials of the United States Railroad Administration, and were constructed by the Power Company under the threat by the Railroad Administration officials that the project would be abandoned and acceptance of the completed work refused by the Railroad Company unless such extensions were made to the bridge in the way indicated. The additional work involved in the substitution and adoption of the Knoxville Plan, and the construction of the extensions demanded by the Railroad Administration was performed by the Power Company under protest, as the extent and cost of the work were thus greatly enlarged, at a time when plaintiff was in effect forced to proceed therewith, as it would have been disastrous to the Power Company to have had the work discontinued after having expended large sums on the project.

It was stipulated between the parties in writing that a jury trial be waived, and all issues submitted to the court, and that either party should have the right to have the judgment of the trial court reviewed by writ of error, as though a verdict had been rendered and judgment entered thereon. The trial court decided that, as the case involved the investigation and determination of complicated questions of fact, and lengthy accounts, a reference to a special referee or auditor would greatly aid the court in reaching a correct conclusion, and accordingly so ordered; said referee's findings of fact and law to be subject to final determination by the court.

Pursuant to the order of reference, the special master was duly appointed and took much testimony, and made a full and elaborate report in the case, and the learned District Judge fully considered all the questions of law and fact arising therein and made special and comprehensive findings of fact and conclusions of law in respect thereto. In his findings of law and fact the District Judge made an extended and lengthy review of the entire case, making 69 specific findings of fact, which to set out in full would unduly lengthen this opinion. These findings, it may be said, strongly and clearly sustain his full and comprehensive summary and conclusions in regard to the issues involved between the parties on their merits, as set forth at the end of the 69 specified findings of fact, as follows:

"It will be seen from the foregoing findings of fact that there was never any contract or agreement or meeting of minds between Mr. Spencer and Mr. Law as to the amount that each should contribute towards the construction of this bridge and track relocation, and I so find. It is quite evident to the Court from all of the testimony in the case that Mr. Spencer originally never agreed that the Railway should pay more than $8,000 as its contribution, and it is equally evident that originally Mr. Law, for his company, never agreed to pay more than $66,000 as his company's contribution. Mr. Spencer testified that he never agreed to pay more than $8,000, and his testimony is corroborated by his sending to Mr. Law on two different occasions the two proposed contracts in question, in each of which the Railway's limit of contribution was set at $8,000.

"On the other hand, Mr. Law never orally or in writing agreed that his company should contribute more than $66,000 to this project, and this is shown by his own testimony to this effect, and his testimony is corroborated by his refusal to accept the first estimate of $119,000 cost as being prohibitive to his company, and further by his refusal to sign the two proposed contracts providing that the Power Company should pay all of the cost of the construction except $8,000. The truth, in my opinion, is that neither Mr. Spencer nor Mr. Law, in the beginning of their negotiations and when the contract was being discussed between them, and the proposed contribution that each should make was discussed, dreamed that a structure then estimated to cost $74,000 would ever, by the wildest stretch of the imagination, cost $350,000. I say it is therefore clear to the Court that the minds of Mr. Spencer and Mr. Law never did meet as to the exact amount that each should contribute. While it is undoubtedly true that Mr. Spencer agreed to contribute $8,000, and Mr. Law agreed to contribute not more than $66,000, Mr. Law had the assurance of Major Wells, who was then the chief engineer of the Southern Railway and a man high in authority, that this $74,000 was to be the maximum cost of the project, and that in all probability it would be lessened. While this statement of Major Wells was not necessarily a guarantee, it certainly was a statement upon which Mr. Law had a right to rely at that time, and upon which he did rely. I cannot attach any blame to either party on account of delay, for the two or three months, in beginning the work under the Wells plan.

I think each side was trying to evolve a plan that would be most economical; and in the meantime prices of materials were going up, wages were growing higher, the declaration of war having demoralized both prices of commodities and the price of labor.

"When Mr. Law received from Mr. Spencer the proposed contract, good business policy would have required Mr. Law to return the contract and call Mr. Spencer's attention to the fact that the figures $66,000 as the limit placed upon the Power Company's expenditure, were not in the contract, and insist upon their being inserted therein or a new proportion of contribution be made. At the time, it must be remembered, the Power Company had already made many arrangements and contracts and provisions for the erection of its dam below the railroad bridge at site No. 8, and at that time it was not clear from the provisions of the first contract that the cost of the project would exceed $74,000; and I think the special master correctly finds that, up to this time, to wit, February, 1917, there had been no meeting of minds between Mr. Spencer and Mr. Law.

"When the new Knoxville plans were evolved by the Railway engineers it appears to the Court that a brand new set of plans was presented, an entirely different bridge was provided for, and an important difference in the relocation of the track set out. It is quite evident that this radical change was demanded by the Railway Company's engineers; and again at this point good business policy should have impelled Mr. Law to write to Mr. Spencer and protest that a different provision for contribution for each party should be provided in the contract. Mr. Law, however, did not do this, and again he found himself in a position where he was afraid to go forward or go backward. He had made large commitments towards the construction of this power plant, and he knew that Mr. Spencer was more or less hostile to the railroad bridge project; but Mr. Law did protest to the person in whom he had confidence, and who he thought would adjust the ratio of the cost equitably, to wit, Major Wells, Chief Engineer of the Railway Company, who had originally made these plans and had kept supervision over them all during the progress of the construction. Mr. Law constantly protested to Major Wells that the new plans were going to cost in excess of his original estimate; and Major Wells, agreeing to this, promised that he would go to Mr. Harrison, the President of the Railway Company, and seek a new adjustment. It should be remembered that Major Wells was not only a high

official of the Railway Company, but was the only one in charge of this matter, competent to handle it, and provide plans and specifications for its construction. He had agreed with Mr. Law about a change in the proposed contract to the effect that the Power Company might do the work instead of the Railway Company. With reference to this project Major Wells was the eyes and ears of Mr. Spencer, and Mr. Law so regarded him and relied upon his assurance that a new adjustment of the cost would be made by Mr. Harrison, the Railway president. Major Wells undoubtedly kept Mr. Spencer advised about the progress of this work, and he should have told Mr. Spencer of Mr. Law's constant complaint about a need for readjustment of the proportionate cost each party should bear. Under these circumstances the Power Company proceeded with the work under the Knoxville plans, which called for a far greater outlay of money than the original Wells plans, upon which the original contract was drawn.

"When Mr. Spencer returned to Mr. Law the contract for the second time, still embodying the $8,000 limitation of contribution on the part of the Railway Company and the unlimited contribution on the part of the Power Company, the Power Company was then so far involved in the construction of its plant that it could not abandon it without great financial loss. It was then in the position of Thomas Jefferson's man who had the wolf by the ear, 'afraid to turn loose and afraid to hold on', and was to a certain extent under a species of economic duress. I cannot hold as a matter of law or fact that going on with the work by the Power Company, after the reception of the second draft of the contract, bound the Power Company either by waiver or estoppel, or that its conduct in going on with the work made this proposed contract a real contract between the parties; for at this time and at all subsequent times Mr. Law was protesting to Major Wells and expecting a readjustment of the proportionate cost that each was to bear; and these protests to Major Wells relieved the Power Company from the presumption of acquiescence in the cost provisions set out in the proposed contract, and still kept the minds of Messrs. Spencer and Law from ever meeting on this vital question.

"So, having found that no written contract carrying the agreement of minds between the parties on the question of the amount each should contribute towards the project was ever made, and further finding that the conduct of the Power Company in

carrying out the other details and specifications, set forth in the proposed contract, does not make a contract between the parties as to the amount each should contribute, the Court is compelled to go back to the agreement originally had between Mr. Fairfax Harrison, President of the Railway, and Mr. Law. Mr. Harrison in that conversation stated, as testified by Mr. Law, that 'The Southern Railway is not asking the Blue Ridge Power Company to give them one cent. We are perfectly willing to pay for such changes as are of benefit to the Southern Railway; but the Blue Ridge Power Company cannot expect the Southern Railway to pay for changes that are solely for their benefit.' Whereupon Mr. Harrison told Major Wells to give the matter preferred attention, and to see what changes were necessary in the Southern Railway's track in order to enable the Power Company to make the development; to see how it could be done in the most economical manner; and that the Southern Railway was willing to pay the cost of the benefits to them, but the Power Company could not expect them to pay the cost of that which was only for the benefit of the Power Company. He told Major Wells to submit his estimate to Mr. Spencer, and then to determine what amount of cost represented the benefits to the Railway Company.

"Mr. Spencer and Mr. Law never did mutually agree what amount each should contribute to this project. All the way through the controversy Mr. Spencer insisted on $8,000 and Mr. Law insisted on $66,000, and having never agreed on what the proportion should be, it seems to me that the Court has to fall back on Mr. Harrison's promise to pay for benefits which the construction of this bridge and relocation of track would be to the Railway. And, after all, if the Court after long and careful and painstaking effort can determine what this benefit is, that will be the just settlement of this whole matter. In equity and good conscience the remainder should be borne by the Power Company, which originally initiated this movement to raise the bridge so as to enable it to pond back its water by the construction of a high dam in order to develop hydro-electric power.

"The Power Company has built for the Railway a magnificent, reinforced concrete substructure and superstructure, E. 60, standard bridge, more than 400 feet long, and relocated and rebuilt something like a mile of its track, eliminating very steep grades and a sharp curve, and finally making a piece of railroad and bridge that is as permanent as the ages, and forms a very valuable link in the Southern Railway's track between Asheville and Spartanburg. This bridge and approaches, outside of the extension, was built at the suggestion and behest of the Chief Engineer of the Southern Railway, Major Wells. The simpler and less permanent plans, known as the Wells plans, estimated to cost $74,000, were practically discarded and abandoned by this same Major Wells in August, 1917, when he presented to the Power Company what are called in this law suit the Knoxville plans, and which called for a far more pretentious bridge structure than the Wells plans had called for. It is true that this work was done at a time when materials were very high and labor costs equally high, but when I contemplate this magnificent piece of work, I cannot but feel that it was worth and is worth what it cost. There may have been some lossage due to delay on the part of the Power Company, and some more or less unnecessary widening of the fill, but under all conditions existing, this should not be charged to the negligence of the Power Company.

"The Power Company expended $261,892.14 on the construction of the bridge and approaches, according to the Knoxville plans. In addition to this amount of cost, Major Durham ordered what is called the extension, consisting of eight concrete spans, and this cost the Power Company $69,698.02. In addition to these amounts; the Railway claims that it did work necessary to complete the whole job, after it took over the bridge and track, at a cost of $20,178.39. Thus the thing that started out with an estimated cost of $74,000 turns out finally to cost a total of $351,768.55 in all. The work costing $261,892.14, and that costing $20,178.39, or a total of $282,070.53, was ordered done by the responsible officers of the Southern Railway. It is therefore unthinkable to me that the Railway Company should ask that this large amount of money should be expended in permanent improvements on its line of railway, and should be called upon to contribute only $8,000. The Court cannot for a moment entertain the thought that such a basis of settlement would be according to law or equity.

"The bridge extension, costing $69,698.02, was ordered by Mr. Durham, who represented himself as the agent or officer of the Federal Railway Administration. I have already found that this extension should not be charged solely to the Power Company, and setting forth my reasons therefor, and this makes it unnecessary to repeat them here. Looking at the equities of the case, the Railway Company has this magnificent extension as a permanent improvement, and this whole

construction will no doubt before a very distant day be a part of a reconstructed and modern line of railroad between Asheville and Spartanburg. I cannot but think that when Major Wells and Mr. Durham ordered these modern, expensive structures, they looked into the almost immediate future when such would become a part of this great railway system. So, the Railway has in its possession and in its use now a bridge of E. 60 burden as splendid as it has on any of its main lines, and realignment and reconstruction of one mile of permanent track, which took the place of a more or less antiquated bridge of one steel span and wooden trestle approaches, some of which wood was undoubtedly in bad condition, and eliminated a very steep and troublesome grade, which often necessitated the dividing of trains in order that the locomotive might pull the divided burden over same.

"Before this new bridge was built, trains passed slowly over the old one and over the heavy grade in question, whereas now since the old bridge has disappeared and the modern structure is in use, trains travel over this new bridge and track at the rate of 35 to 40 miles an hour. Whereas on the old bridge there were slow orders for trains, and some witnesses testified that the trains ran by this point as slowly as four miles an hour, and often persons got on and off the trains at this point while they were in motion. Can any one doubt, therefore, that the Railway has been greatly benefited by the construction of this modern bridge and relocation of track?

"Under all these facts, then, how much has the Railway been benefited by these new constructions? Before giving my opinion and answer to that question, I wish to discuss the part that the Power Company should bear under all the facts of this case. It should be remembered that the Railway Company, at the time this project was originally discussed, was contemplating a relocation of much of its line through the mountains of Western Carolina between Asheville and Spartanburg. At such a time the Power Company desired to build its dam and power plant on Green river, over which the railroad bridge passed. The Power Company had in mind the construction of a dam at site No. 6 above the railroad bridge or at site No. 8 below it. If site No. 8 were selected, it would become necessary to a profitable development to raise the water in the pond so that it would submerge the railroad bridge, and without the consent of the Railway Company to a rebuilding of the bridge the dam at site No. 8 could not and would not be chosen. According to the evidence as related to the dam, the Power Plant would cost more than $200,000 less if erected below the dam than if erected at site No. 6 above the bridge, and the erection of the dam below the bridge would also obviate the necessity of a flume line which would be necessary had the dam been erected above the bridge. So under these circumstances it became very valuable and important to the Power Company to have the dam erected below the bridge. The new bridge, having once been built across the lake or pond of the Power Company, would have to stand as such unless later on the Power Company were to give permission to draw off the pond or lake so as to permit additional or new piers, in case it should become desirable, which would have entailed great expense and trouble. It therefore became apparent to the engineers of the Railway and to the Power Company that these piers in this lake should be of a permanent character, and to that extent the Railway had a right to insist upon permanent piers wherever the water from the lake stands.

"The Power Company expended $331,-591.16 on this construction, which includes the bridge extension, while the Railway paid $20,178.39 to complete the work.

"I am not concerned so much with finding the benefit of this construction to the Power Company as I am in determining what has been the benefit to the Railway Company, because that is the expression which I must interpret, and, as I see it, the only promise or agreement upon which I can make a finding in this case. Certainly the construction of the dam was not worth to the Power Company the sum of $331,591.16, and certainly under all the circumstances it was not worth this much to the Railway. If the Court were possessed of the wisdom of a Solomon, it might be able to find with mathematical certainty the amount of the benefits of this work to the Railway Company, but unfortunately it neither claims or possesses such knowledge, and cannot hope to make an absolutely correct finding.

"However, I do believe that in equity and in justice the Railway has been benefited at least one-half of the total cost of this entire construction, and I so find.

"If the proposed written contract were held by me as binding, I should not allow the claim for $20,178.39 as an offset to the Railway Company; because this outlay was made by the Railway Company after it had accepted the new bridge and track and had put their trains to running over same, and with the knowledge that the plaintiff was claiming a

large sum from the Railway Company on account of work already done.

"If I were construing the proposed contract as binding on both parties, I should hold the Railway Company responsible for the cost of the bridge extension, although in some respects this seems a hardship. The Railway Company never signed a lease to the federal authorities. It never affirmatively ordered the extension, which was required by Major Durham, and in this light it seems a little unfair to charge them with this cost. On the other hand, it would be manifestly unfair to charge the Power Company with this cost, as the extension was built by them under protest and under a threat that they would be run off the right of way of the Railway if it were not built; and it has no reference to or connection with the proposed contract or Knoxville plan, and it would therefore seem exceedingly unfair to charge the Power Company with the cost of this extension of the railroad, possessed and to be used by it so long as the road is maintained in its present location.

"The amount of $750.62 on account of removal of the old bridge, and $4,095.65, value of old rails, should be regarded as a part of the total cost of the project.

"I find that the benefits of the Railway Company on account of the construction project are one-half of the total cost of same; the total cost being $356,614.82, which would make the benefits to the Railway amount to $178,307.41. Of this amount the Railway Company has already paid $10,088.20, being one-half of $20,178.39 expended by the Railway Company after it took over the bridge, and which $10,088.20 should be deducted from the $178,307.41, and for the difference, being $168,219.21, the Court gives judgment in favor of the plaintiff and against the defendant; with interest on this amount from the 24th day of March, 1920.

"It is the further judgment of the Court that the costs of this action be equally divided between the plaintiff and the defendant, including the allowance to the Auditor or Special Master."

■ Sundry exceptions to the findings and conclusions reached by the District Court were made, and requests for special findings of law and fact were also made by defendant, which were overruled, and exceptions preserved, and on April 3, 1928, the court entered its judgment against the Railroad Company for $168,219.21, which is appealed from herein, with interest from March 24, 1920; the costs to be divided between the parties equally. To this action of

the court rendering judgment the defendant Railroad Company duly excepted, and tendered 59 assignments of error. These assignments of error are quite elaborate, but need not be gone into in detail or set forth herein in full, since they one and all involve, and in the last analysis depend upon, whether the District Judge properly determined the questions of law and fact presented for his consideration, and whether the record contains sufficient testimony to sustain such findings. If so, this court is no less bound by the issues properly passed upon than are the parties litigant.

The statutes providing for the waiver of trial by jury in civil cases, under which this case was submitted to the trial judge (Sections 649 and 700 of Revised Statutes; Title 28, §§ 773 and 875, USCA) clearly set forth the effect to be given the trial judge's action when said statutes are invoked. The two sections applicable are as follows:

"Issues of fact in civil cases in any district court may be tried and determined by the court, without the intervention of a jury, whenever the parties, or their attorneys of record, file with the clerk a stipulation in writing waiving a jury. The finding of the court upon the facts, which may be either general or special, shall have the same effect as the verdict of a jury." (R. S. § 649; title 28, § 773, USCA.)

"When an issue of fact in any civil cause in a district court is tried and determined by the court without the intervention of a jury, according to section 773 of this title, the rulings of the court in the progress of the trial of the cause, if excepted to at the time, and duly presented by a bill of exceptions, may be reviewed upon a writ of error or upon appeal; and when the finding is special the review may extend to the determination of the sufficiency of the facts found to support the judgment." (R. S. § 700; title 28, § 875, USCA.)

We think there can be no question that the findings of fact of the District Judge have the same force and effect as a verdict of a jury. Indeed, counsel for the appellant, in their reply brief filed in this court, aptly set forth the law in this respect as follows: "The findings of fact by the District Judge have the same force and effect as the verdict of a jury. Only those findings of fact can be questioned, which have no reasonable support in the evidence."

■ Assuming that some of the findings of fact in this case should be treated as special findings, enabling this court to consider the sufficiency of the testimony to support the

judgment as found, still, in this case, the testimony amply supports the several findings and rulings of the trial court.

It seems needless to cite authority to support the proposition that as to matters in which his court is not actually bound by the trial court's findings, as it would be by the verdict of a jury, it is not within our province to usurp the authority of that court by substituting our judgment for its judgment in the ascertainment of facts when the evidence supports such findings. We should do so only when the testimony is clearly insufficient to support the findings. Fleischmann v. U. S., 270 U. S. 349, 355, 356, 357, 46 S. Ct. 284, 70 L. Ed. 624, and cases cited.

We have given much thought and consideration to the questions involved in this case, and to the rulings therein, and to what is a correct determination of the same, and we are forced irresistibly to the conclusion that the learned District Judge correctly passed upon the questions of law and fact submitted for his consideration, and, in so doing, reached a correct and true solution of the issues involved. Indeed, we are impressed with the fact that, taking into consideration the unusual and difficult character of the case, he has, with great perspicuity and skill, arrived at what is a proper, just, and fair conclusion of the merits of the controversy between the parties. Certainly we cannot see our way clear, within the rules of law applicable to this court in reviewing his action, to modify or change the same, but, on the contrary, feel that it is our duty to accept, approve, and affirm his findings and judgment, as supported by the proofs and testimony, and it will be accordingly so ordered, and the judgment affirmed, with interest, costs in this and the District Court to be divided equally between the parties.

In the second-named case, No. 2785, the positions of the parties are reversed in this court, that is to say, it is an appeal by the Power Company against the Railroad Company, instead of the latter against the former, in which the Power Company insists that the sum found in its favor against the Railroad Company, to wit, $168,219.21, being one-half of the total cost of the bridge, its approaches and extensions, was erroneous; that the Railway Company was liable to it for the benefits received from the expenditures made by the Power Company; that the Railway Company was chargeable with a greater sum than allowed; and that the court should have held the Railway Company liable for the total amount expended in connection with the improvements, to wit, $356,614.82 less $74,194.-32, leaving due by the Railroad Company to the Power Company the sum of $282,420.50 instead of $168,219.21, the amount adjudged in its favor by the trial court, with interest.

The appellant, Power Company, made sundry exceptions to the action and rulings of the trial court, involving the court's conclusion, and its right to a judgment for the sum of $282,420.50 claimed by it, rather than the amount awarded in its favor, $168,219.21 in the first-named appeal; and said appellant, by appropriate assignments of error, presents for the consideration of this court the correctness of the rulings complained of. The decision of the lower court in case No. 2781 largely, if not entirely, disposed of the questions sought to be raised here, and this is particularly true as respects the amount for which the Railroad Company is liable as adjudged in case No. 2781. If the Railroad Company's indebtedness was correctly ascertained in that case, then the appellee therein cannot, in case No. 2785, accept the benefit of that judgment, and seek to reopen the entire subject of liability as settled in case No. 2781, nor can the amount sought to be recovered be added to in this court by changing the basis of liability. The Power Company, with the judgment entered in its favor in case No. 2781 in effect, and certainly with no prayer for reversal thereof, as required by section 997 of the Revised Statutes (28 USCA § 862), cannot secure the relief it asks in its appeal in case No. 2785. The amount of liability of the Railroad Company, as ascertained in the first-named appeal, No. 2781, was for such sum as it should justly pay for the benefits received in the rebuilding of the bridge and approaches and extensions to its roadbed and track.

It is doubtless true that the Power Company and the Railroad Company both feel that they have been forced to bear an undue proportion of the burden involved; still, with the amount expended settled, and the legal status and liability as between the parties determined, the question upon whom the burden should fall heaviest cannot be met with absolute certainty. Neither the Power Company nor the Railroad Company can be said to have been entirely free from blame in the circumstances, and while the Power Company may justly feel that the Railroad Company received, by reason of the greatly increased value of its property, arising from the extent and character of the improvements made, the benefits resulting therefrom, without taking and bearing a corresponding proportion of the burden incident thereto, still,

the Power Company was perhaps more at fault, in this, that it took the initative in what was done, and should not have proceeded upon an undertaking of the importance and magnitude of the one in question without having previously taken the necessary steps to guard against the possibility of consequences such as have arisen, which ought to have been reasonably foreseen by both parties.

For the reasons stated, the action and judgment of the trial court in case No. 2785 will be affirmed, with costs in this and the District Court to be divided equally between the parties as in case No. 2781.

Affirmed as to both cases.

WILLIAM C. COLEMAN, District Judge. I concur in the majority opinion that, taking all of the rather unusual facts of these cases into consideration, an equal division between the Railway Company and the Power Company of the entire cost of construction is the most equitable solution of the problems involved. I therefore would concur in toto in the affirmance of the judgments of the lower court, were it not for the fact that I believe that court to have fallen into an error of mathematical calculation as a result of which the judgments do not in fact do what they purport to do, i. e., divide the total cost equally between the parties, and that therefore the cases should have been remanded in order that the judgments could be corrected as hereinafter explained.

Also it seems to me that the bridge extension feature of the cases, involving $69,-698.02, and presenting a separate and distinct question of law, requires some separate consideration. The circumstances surrounding this outlay are as follows:

After the bridge and track approach of dirt fill were nearing completion in the fall of 1919, Mr. Durham, chief engineer under federal control, notified the Power Company that he would require an extension of the bridge on the east end, consisting of eight additional piers and girders, to be built of concrete and of approximately the same dimensions and proportions as the bridge proper; and he advised the Power Company if this extension was not built as so required, he would not accept the new bridge and would refuse to surrender and abandon the old bridge and track. Mr. Durham disclaimed all responsibility as agent for the Railroad Company, and the Power Company did not notify or take up with any officer of the Railroad Company the matter of this construction or secure the Railroad Company's authority to construct or promise to pay for the same. The government made no charge on its books against the Railroad Company on account of this addition and betterment, and there has been a final settlement between the government and the Railroad Company covering the period of federal control.

The Railroad contends that the result of the judgment of the lower court is to require it to pay, as an adjudged benefit to it, one-half of the cost of the bridge extension not covered by any agreement which it made and not ordered by it, which was shown to be unnecessary and not required by good engineering, but which was constructed by separate arrangement between the Power Company and the United States Railroad Administration. It is urged that the Railroad Company cannot be estopped to deny liability for what was done by federal authority, because to constitute an agency by estoppel the person so estopped must have either represented, or permitted it to be represented, that the alleged agent was in fact his own agent; whereas, here, it is not shown that the Railroad Company made any representations as to Mr. Durham's authority, unless its silence be construed as such, and he himself had expressly denied having such authority. These facts alone may not constitute an estoppel, but thereafter on March 24, 1920, when the Railroad Company accepted this bridge extension, abandoned the old bridge and track, and transferred its trains to the new, with knowledge of the Power Company's claim and without requiring an accounting from the government for its cost, the Railroad Company must be held to have done so cum onere. Prior to the time the Power Company conveyed the right of way and turned over the bridge to the Railroad Company, the latter was notified of the Power Company's claim against it, but without requiring a withdrawal of the claim, and without imposing any limitation thereon, the Railroad Company accepted a deed for the right of way and accepted the bridge and other improvements and continued thereafter to use the same as a part of its permanent equipment. To permit it to retain and use such a structure under such circumstances without paying something therefor would be contrary to every principle of equity. I believe that the judgment of the lower court in dividing the cost of this construction between the Railroad Company and the Power Company, just as it purported to divide the cost of the other items of construction, is entirely equitable.

The lower court found the total cost to

have been $356,614.82 and that the Railroad Company and the Power Company should each pay one-half, or $178,307.41. In the total cost was included an item of $20,178.39 which had been expended by the Railroad Company to complete the work. This entire sum, as claimed by the fifty-seventh assignment of error, and not merely one-half of it as the lower court calculated, should therefore have been credited to the Railroad Company in fixing the amount of the present judgment, which thus would have been $158,129.02 and not $168,219.21. Accordingly, I feel that both cases should have been remanded for entry of corrected judgments in conformity with this calculation.